That case is going to be submitted, but I am going to ask counsel for that case to both stay in case we have some more questions we want to ask at the end. And while people are shuffling in, we'll go ahead and call the next case, which is Dalton v. Biden, case number 234107. We'll ask counsel for the appellant to come up. Okay. Let's go ahead and move on to our next case. We've got a couple more people coming in, but we're going to go ahead and get started with case number 234107. Counsel? Thank you, Judge Carson. Harry Graber for the Dalton plaintiffs. I'll do my best to reserve three minutes for rebuttal. I'm not going to pretend as if you guys have not just been talking about this for 30 minutes, so I'll just pick up where you left off. I want to address a handful of questions that you raised. Starting with Judge Rossman, the question about cause of equity or cause of action, how it relates to ultra-bureaus exception. As my friend was getting at, they really do overlap. And this court's analysis in Wyoming, I think, shows exactly how you do that. When something is ultra-bureaus, sovereign immunity doesn't apply because it never attaches in the first place. It's an individual action. And then you rely on equity, a court's inherent actual powers to supply the cause of action. Because when a governmental actor is acting in excess of authority and directly injuring you, there's a longstanding equitable practice to prevent that. It's exactly what happened in McAnulty, in Youngstown, in Dames and Moore, in Armstrong, again and again and again, as this court has recognized. That's the distinction. So with ultra-bureaus, one thing that gets hard with these cases is that, like the term jurisdiction itself, it gets used kind of imprecisely at all different times. What we're talking about here is a governmental actor using power they never had authority to wield. And the longstanding practice there is that when you're on the receiving end of that unlawful action, sovereign immunity doesn't apply again because the sovereign agent has gone beyond the ambit of their power. And equity supplies the cause of action. My friend brought up the APA. Since the APA was enacted, it's always been a complementary scheme. The D.C. Circuit held this in DART in the late 80s. Every federal court to address the question has agreed because Congress needs to speak very clearly when it wants to displace traditional equitable powers of the courts. And the bread and butter equitable power of the federal courts is ultra-bureaus review. Counsel, I'm sorry. I just was fixated on something you said a moment ago when you said the executive was utilizing an authority they were never delegated or they did not have. I did not read any briefs here to argue that the President doesn't have delegated authority from Congress to declare national monuments under the Antiquities Act. Rather, I read your briefs to say you're challenging the decisions within the statute, particularly subsection A, that in the exercise of that authority delegated, the President exceeded the bounds. Did I misconstrue your arguments? No. I want to be very precise about this because I think this gets to the point about one of the main sources of confusion which comes to this turn of phrase about which mistakes of law count. So the President has authority under the Antiquities Act to set aside land for, let's just say, A, B, and C. Our basic contention is that he set aside land for D, E, and F. He used the Antiquities Act in a way that he was never authorized to do. What's clear about – what's very important to sort of disentangle is this notion of when is someone behaving wrongly. That's the kind of line of cases that get picked up in Larson and I think kind of gets wrapped around the axle along the way. What's key is that there's a big difference between exercising power you never had in the first place, doing something you were never authorized to do, or wielding that power in a way that violates some extrinsic source of law. So in Larson, the example is that you might have breached a contract, but no one disagreed that the officer at issue had the power to wield. So here our point is, yes, the President has Antiquities Act power, but it's defined and enumerated. And just as in McAnulty, for instance, when the executive officer uses that power in a way that Congress did not authorize, it's individual will. You're doing something you were never allowed to do. Yeah, but isn't it historically the check on that in congressional action? I mean Congress wasn't shy when it dealt with Wyoming and Alaska subsequent to that. And so I think what you may hear as some struggle here on the bench is where is our authority for the judiciary then to step in and say what you just said, how the President has exercised authority he was never delegated when, again, historically, one, courts have not said that, and two, Congress has been the other branch of government to intercede. So I think that I want to be careful about the buckets in which that falls. I think for the exact same reasons that the D.C. circuits held time and again, you can say that that's a reviewable question. The President does not get to do whatever he wants for whatever reason, but the Antiquities Act and courts have nothing to say about it. So there's the important threshold questions about your ability to hear this case, your ability to issue a remedy. Then there's the question you asked before in the other case, sort of like what makes this monument different from all other monuments. Like Congress has interceded in the past. It hasn't here. These are new. But why should this be the first case? I think the key point here is that for all the objects that we at least identify, the five that we emphasize, landscapes, regions, ecosystems, habitats, animals, the reason this case is so important is because they rest on the outermost bound of the President's conceivable Antiquities Act power. The key part of the objects that we identify is that if they are accepted, they render the act effectively limitless. That is why this case is where you cannot go further than these proclamations go. So the reason our case is different is, is there a limit at all? And for federal courts to look at a federal statute and identify and define a limit, that is your bread and butter. That's your main job. And we fall very comfortably within the ultra-various tradition that allows for that. Why do your clients have a cause of action here if there is only, even in the rubric that you described, which I thought was very helpful, still a free-floating right? This is, I think, with the Safe Streets point that's important. We're not pressing a free-floating right. We're not seeking to kind of – what was happening in Safe Streets is that – and Judge Briscoe emphasized this a lot at the start of her opinion. The plaintiffs were not directly regulated by the government program they were complaining about. They were seeking to use equity in this very novel and aggressive way to go upstream and unwind all of Colorado's legalization regime as conflicting with federal law because they didn't like its incidental effects. That's not our case at all. As my friend was getting at, we're pressing core private rights. We're in the exact same spot as the plaintiff in McAnulty or the mill owners in Youngstown. In Youngstown, there's no federal substantive rights under the president's war powers or under any of the statutes that could have applied. Those are core private rights. It was business interests, property interests. So it doesn't have to be a constitutional right like it was in Sima? Correct, and it happened to be a constitutional right in Sima, but that is definitely not necessary. McAnulty is a perfect example. This is the canonical case in ultraviarious review. There you had a medical school. The postmaster general kind of thought it was a quack medical school and he stopped people from sending checks to it. They didn't have any federal substantive rights under the Lottery Act. They wanted their property. They were entitled to monetary interest, the same kind of pocketbook interest that our guys are pressing. So you can have a right, as my friend was saying, you can have a core private right that is being injured by way of unlawful governmental action. That is traditional ultraviarious review. I want to bring up one point. It sounded to me like your opposing counsel was suggesting that your right had to be in the property itself.   And that is not what I just heard from you. You said a pocketbook right, which for the state and some of these folks is royalties, different kinds of money coming from leasing and that type of thing. Right. So maybe that shows that you've had an injury by this, but how does that show that you have a property right in the federal lands as argued by your opposing counsel? So I think we were talking about slightly different things. I don't think you need a right in the federal land property. In order to have a injury cognizable in equity, and we cite, I forgot if it's in the opening of the reply, Judge Wilkinson dissent that details this a lot. I'll point there. But you need a right cognizable in equity, a traditional equitable right. That can come from a host of sources. My friend is saying it's constitutional rights. It can come from federal statute. It can come from the common law. It can come from state law. But a property interest, for instance, the ability to run your business, is about as traditional as it gets. So I don't think you need an interest in the land itself. You don't need to own the land necessarily. But when you've been given a permit, for instance, to work on the land, that permit becomes harder. That's a quintessential Article III injury, quintessential kind of injury. Let me ask you a question. So has anyone in this case been required to pay a fee under the new scheme? Yes. Every time that we fill out a permit, any of our guys, Zeb, any of the Blue Ribbon folks, they need to pay a fee. I know they need to, but have they done it? Because as I was hearing over here on the Appalachian side, they're suggesting nothing's happened yet. This is the old RFP that's controlling. And as a result of this designation, nobody's paid a fee. Nobody's been blocked out of their mind. Nobody's had to have anything happen to them. So no, that's not right. And they agree with this, I think, in their declarations. I don't think the government will contest this when I come up here. It's that the standards for permits have gotten higher. Everyone agrees about that. We attested, the best example of this is Zeb Dalton's declaration. With respect to his pending future and existing permit schemes, he has to now expend more administrative costs in order to comply. It's a lot harder to get a permit. Those are real out-of-pocket costs that are happening now. And there's a bunch of examples of that in the declarations. Has anyone who has a private right, a property interest within the federal land, either paid a fee because of it or chosen not to exercise their right because they'd have to pay the fee? Yes, the best example is with Kyle Kimmerle. So what happened with Kyle, again, the government agrees with this. Because of the monument designation alone, forget the management plans, because of the monument designation alone, he now needs to deal with a new and costly validity exam. It's going to cost somewhere within a few hundred thousand dollars at least. That has deterred him from moving forward on his claims. And that's alleged in your complaint? Yes, that's in the declarations, I think, twice over. Are these issues preserved for us, though, in your opening brief? So I think absolutely, in that we did not raise standing on our own, because we thought standing was straightforward and obvious. We raised it in the reply to respond to their argument. But this is a subject matter question. I don't think it's going to – it's not the sort of thing that we need to affirmatively argue or waive. You mentioned standing. How would you respond to the argument that there's a lack of redressability here regarding standing? So I think that there's two sort of redressability questions, I think, at play. One is the old, like Fed courts, chestnut as to whether a remedy can run against the president. We think yes, but there's no need for this court to reach it. What's key, and I think the district court omitted this point, what's key is that we named all the subordinate officials implementing the proclamations. And Justice Scalia, just as Justice Scalia explained in Franklin, when you can join or issue any kind of remedy running against a subordinate official, that's a traditional sort of remedy in these instances when you're dealing with those implementing an executive order. But for us to join the Department of the Interior, the agency heads, it would be so on the basis that what they are carrying out is only based upon an unlawful proclamation, right? Yes. So how effectively then do we issue a remedy to departments to say you stop what you're doing when the president of the United States has told them that this is what they must do without, by virtue of that, also enjoining the president? It's a very important, there is a big difference between reviewing the president's handiwork and issuing a remedy running directly against the president. Because after all, in Youngstown, you're reviewing the president's handiwork. That dealt with somebody implementing an executive order. It's the same, and again, Justice Scalia's opinion in Franklin illustrates this. There's separation of powers concerns that sometimes come with the recipient of the remedy. But just as with Congress, for instance, you obviously can review an unconstitutional law, even if that involves reviewing Congress's handiwork. You just can't enjoin Congress from passing it. It's a remedy question. I'm short on time, but I just want to bring up one point just with respect to the remand issue that was being raised before. As my friend brought up, I think that a narrow remand, I'm putting aside the doctrinal points. I do think the merits are fully presented here for what we were saying at the start. But I think a narrow remand loses a lot of force in light of what the district court said. Along with the call for guidance that my friend was emphasizing, I want to bring up one part that's from page 18 of the opinion. The district court said, even if individual plaintiffs are granted leave to amend their complaint, they would not be able to plead the ultra-various exception. And that's because we talked about the merits below. And the district court adopted the government's position that essentially the Antiquities Act allows the president to do anything he wants, to declare any object that he thinks worthy of protection a national monument. What the district court said is, I'm going to stick to that unless I get guidance from this court. Judge Rosman, you were asking about what kind of guidance in particular? A definition of the word object. That is what we need, at least for our claims, a definition of the word object. The last thing I would add before sitting down and trying to reserve some time, is that that's all the hard work this court needs to do. Once you do the hard work of defining object, I think it's awfully easy to see whether the five things that we emphasize and the five things that we rely upon fit that definition. Especially because if you take our briefing, the Government's Incorporated briefing, the 41 amici, and the like, every single possible thing to be said on this subject has been said. I agree that the normal rule is remand in those kind of circumstances, but it's a rule with a lot of exceptions. I think this one fits it like a glove. I'll reserve the last two minutes. Good morning again, Your Honors. John Beeson on behalf of the Federal Defendants. This time I hope to reserve three minutes. I'll start just quickly on the remand point. This court in Haybecker said, even on a pure question of law, the court will address it in the first instance only in extraordinary circumstances and only when there will be a miscarriage of justice. There's no reason to do that here. There are a lot of complex issues about whether they properly pled particular designated objects or protected, or whether they properly pled the boundaries of the monument that are not briefed and this court need not get into. Turning to the plaintiff's, sorry, appellant's remarks, the problem here is that the individual plaintiff's claims are premature. No plaintiff has been denied a permit because of the proclamation. No plaintiff has been asked, been required to pay a fee because of the permit. Are plaintiffs on notice that they're going to have to pay a fee? So taking Mr. Kimberley, for example, he has a mining claim. To proceed on the mining claim, he needs to submit a completed mining plan of operation. Once he's done that, because it's in reserved land, there needs to be a validity exam and the agency can bill him for that, but we have not reached that point. That is not right because he has not completed the mining plan of operation. No, I understand that, but don't you think that that specter could cause him to not exercise the rights he has to mine that or to go through the process? The point of standing is to make sure we have a live controversy. He's alleged he's lost $22 million in revenue and $2 million to $3 million in profit because he didn't want to pay a $100,000 fee. That is not a plausible inference from the facts. I mean, that's definitely something we would not normally decide in the first instance on those facts, but let me ask you this. So if he alleged in a declaration attached to their complaint, in an allegation of a complaint they did it, that he intended to proceed with mining his claim, but at this point he understood from the interim management plan that it was going to cost him $100,000 and that he didn't have $100,000 to spend on that, would that be a sufficient interest for him to then be able to bring suit under this? In our view, there are two issues with that. The first is we don't think it's ripe yet because he hasn't been asked to pay the fee. He has not completed the mining plan. You don't contest that he's going to have to pay a fee, though. Are you going to be on the record and say that he gets it for free? No. Before the issue is ripe, he needs to complete a mining plan of operation so that the agency can proceed and there is a ripe dispute. If the agency tries to charge him a fee and he thinks it's unconstitutional, he'll have a ripe APA claim at that point. Do you agree that he has to operate in the whole scheme of what's going to happen on the way to getting his permit for his ability to mine? He has to comply with it. He has to begin his process knowing that at some point he's paying you a fee. Right. If he doesn't have the money to pay the fee that didn't exist before, why would he? He doesn't have to pay the fee until after he completes the mining plan of operation and the exam happens. I understand that. That's not me being clear because he's undertaking all of these tasks knowing that there are a course of things he has to do. If he's undertaking the task saying, I have a mining claim, I want to mine it, I have to put together a mining plan, that's going to cost me some money. At the end of it, I'm going to have to pay $100,000 to the federal government for this examination. He says, I don't have the $100,000, so I don't want to take the first step. You're saying he's got to risk it. He's alleging that he has $2 million to $3 million in lost profit. We think it's not plausible that he would forego that to avoid $100,000. I'm just trying to get at this in generalities. Now we're getting into plausibility, which requires review. You would agree with that? You can't tell us there's no review and then tell us we have to consider the plausibility of things. There's jurisdictional review. Jurisdictional facts are within the course. Fair enough. That sounds a lot like a Twombly kind of issue. The second point I'd make about the mining claims in particular, there's no dispute that there are habitations from before the Crusades on the land he wants to mine. Even under plaintiff's theory of what's a proper object, that land is properly reserved, so it's not redressable. There's no way he can get that aspect of the mine mentioned. We're at a very early procedural stage. We're just looking at the allegations. You might be right, but does that matter now? The court in Holt says that it can evaluate factual determinations in connection with jurisdictional determinations on standing. We put in evidence that these habitations are on this land. Under plaintiff's own theory, that land is properly reserved. Even if the proclamation of problematics in other places, he will always have to pay that fee, even under his own theory of what the Antiquity Act allows. There's no redressability on the fee issue. Tell me about that. You said you put in evidence on that. We put in affidavits, yes. At the district court? Yeah. Before the district court in connection with the motion to dismiss on jurisdictional grounds. This court recognized in Holt that that type of evidence is appropriately considered. But the district court didn't consider it. Right, but because it didn't reach standing, because it decided on sovereign immunity. Would you advocate for that same approach here? If we were to say that sovereign immunity applies regarding these proclamations, is there any read for us to address standing? You would not need to read standing, I think, if you decide on jurisdiction. We also think cause of action is a very narrow ground you could decide on, and we don't think they've shown that either. Going back to standing, though, in case we are wrestling with that question, I'm struggling with the redressability aspect of it, particularly because you have individual plaintiffs and their circumstances are all different. You were here arguing on behalf of federal defendants against another set of plaintiffs, and there's sort of the general question of redressability if we were to grant relief to enjoin the proclamation. But then you were just discussing with Judge Carson, each individual plaintiff has a different sort of redressability analysis as well. So how would we navigate that minefield of redressability? Well, I think that most of the plaintiffs, the issues are speculative and hypothetical at this point. They're not ripe issues anyways. The rancher, for instance, has not applied for any range improvements since the proclamations were issued. But can't the suit proceed if one of the plaintiffs has standing? Yes, but we don't think any of them do. I was just saying that we don't think redressability is an issue for the rancher. The issue there is his claim is not right. Well, these cases were consolidated, so the state of Utah says, look, if you enjoin the 2021 proclamation and revert it back to the 2017, that reduces the size of the monument, and the harm they've suffered is greatly reduced, then that's enough for standing. So why isn't that right? So if you look at the harms they've actually alleged, if you review their declarations and our declarations and the allegations in their complaint, their primary allegations concern the mere fact that there's increased visitation of the monuments. First of all, it's not plausible that that's injuring them when they are out there advertising to bring tourists to the monuments. But in any case, those type of issues won't go away just because the monument boundaries change. People already know about it. The facts are out there, both because of their advertisements and because of the proclamations. So changing the monument size won't redress that issue. There are still going to be people coming to these areas. So I think you need to look, in particular, whether reducing a lot of the standing allegations that the state and county make go to, in general, the fact that there are monuments here. They don't have anything particularized to the fact that the boundary difference between the Trump proclamations and the Biden proclamations. And they haven't explained how that, in a particular way, they haven't alleged how that actually causes any injury. Turning to, briefly, the cause of action, I think Altavera's and equity cause of action are distinct. For equity, you need a government act in excess of their power. But you also need a legal injury. My friend pointed out Youngstown. There, the government seized someone's steel mill, a clear invasion of a property right. We don't have anything like that happening yet here because those things haven't happened. It's premature. Altavera is separate. It's whether or not the official is acting beyond what they can do on the plain face of the statute. On Pellant's approach, any dispute of statutory interpretation would give you an Altavera's claim. They point to no limit on where any dispute of, any routine dispute of statutory interpretation, even if there's reasonable construction on both sides, they would say, if our statutory interpretation is right, then we have an Altavera's action here. If there's a single object that doesn't meet our preferred definition, understanding of the terms under the statute, then that's Altavera's. But that approach can't work. That effectively collapses Altavera's into an unlimited review that's more expansive even than the APA already is. So you need to have something that's clear, plain, obvious on the face of the statute. A routine dispute where both parties have differences on a reasonable construction of the statute, that's not the type of dispute where Altavera's analysis is appropriate. Well, you have a statute, though, that is seemingly right for construction of things like, is the amount of land surrounding the object to be preserved as small of a parcel as possible? I mean, it seems like those are the kind of things that are easily reviewable and not just these wholesale, gosh, just because you disagree with it. If they allege facts as to why that might be an appropriate size of a reservation, I mean, isn't that what courts do, look at that to see if it's right? Under the APA, that is what courts do. But this is not APA review. It's not abuse of discretion review here. The question is whether the President is acting completely outside the bounds of his authority. Congress told the President to make a determination about how much land was necessary for the care and management of the objects. That was delegated to the President, not to the courts. Well, let me ask you this. So Judge Federico asked you, he said, could they designate the whole state of Utah? And you said, oh, no, clearly not, because they don't own the whole state of Utah. Could they designate all of the federal land in Utah and it not be reviewable? The question is whether there's a bona fide basis for the designation. And I think it's important to emphasize that Congress is very engaged here. Congress has not been in absentee land. No, no, that's not responsive. Can they do it? If they have a bona fide basis, they can designate any federal land where they believe there's a bona fide basis that there are legitimate needs to protect objects like historical. I mean, if they went through and identified various grasses and junipers grow all over Utah, stupinions, there are all kinds of historic Mormon sites in Utah that are out on federal lands, old historic trails. Under your position, they could reserve the whole state of Utah's public federal land and it would not be reviewable. This is federal land. The recourse there would be political, not judicial review. Your answer is yes. Yes, yes.  I'm sorry, go ahead. Oh, thank you. Is it the government's position that the Antiquities Act is ambiguous? We believe that we've made a reasonable construction of the statute here. OK, so that didn't answer the question. Say more. I think, obviously, the terms are open to different constructions. We believe that we have made a reasonable construction of the statute here. So would we determine if it's ambiguous before or after applying the traditional canons of statutory construction? I think you would interpret it using the ordinary tools of statutory interpretation, but you only do that once you reach the merits, if it's reviewable. That's not the question you're asking for Altavira's review purposes. The question you're asking for Altavira's review purposes is, is this patently obviously wrong? How can a statutory construction not be part of the Altavira's analysis when we're trying to situate where the discretion resides? Isn't that part of the task here? So there are two different statutory interpretations. One is, is something patently or obviously wrong under the statute? That is the Altavira's question. Another one is, how do we apply this particular provision in a granular circumstance? In our view, that's not properly part of Altavira's review. And just one final point. You said these arguments weren't raised before, but they were raised before. In 1908, President Roosevelt reserved the Grand Canyon, 800,000 acres, very large. The only difference from the reservations here is that it's not as densely populated with native artifacts as these monuments are, which are actually talked about in legislative history. How did they ever reach the merits to determine that the Grand Canyon was appropriately designated? So in 1920, the United States brought a suit to quiet title. So there was no sovereign immunity issue. There was no cause of action issue, because the United States brought the suit. And in 1920, the Supreme Court affirmed that that monument designation was proper. And I think if you go and look at the briefs in that case, the arguments that the appellant made in that case about why the designation was improper are quite similar to the arguments planners are making now. So let me see if I can. So like quiet title act kind of case. Yeah. All right. I'm going to let you go over here, because I have a question here. So your position is, if you wanted to in this case, after the president declared the monument, the United States could file suit to quiet title and ask a court to uphold the validity of the monument? Yes. There would be no cause of action issue there, because we'd have a cause of action. OK. There'd be no sovereign immunity issues there. I got it. So it's sounding to me like, but who do you have on the other side of that? Who's on the other side of the V in your quiet title action? So in Cameron, it was a miner who was trying to claim a mining site at the head of the Bright Angel Trail, and trying to maintain structures there that essentially charge people to use the trail while claiming to be doing a mining operation. And they brought a suit to essentially contest his patent to the land.  All right. I don't have it. Do you have anything else? I don't. OK. Thank you, Counselor. You're out of time. All right. I think you have a couple of minutes. OK. So I'm going to try and cover a good amount of ground in a minute and 46. On standing, two quick points. One is the government ignores the deterrent effects from standing. We're not complaining about paying a fee, necessarily. We're having a permit denied. It's the higher administrative costs and deterrents that come with even more burdensome regulatory scheme. I want to emphasize with Kyle Kimberley two other quick points. Judge Carson, the point you were asking about, what if he raised this? He raised that expressly. It's in his declarations. The other part, just more doctrinally, about redressability. The government's wrong twice over. One, with redressability. What they're confusing is redressability on the merits for standing purposes. For standing purposes, you take our view of the law. We say it's non-separable. But also, it's incomplete. The objects they're talking about, all they say in the declaration is that in the 432 acres, there's some objects. We have no idea what the smallest area compatible is for it. And it doesn't answer Kyle's independent ground for standing, which is that all of his claims have cratered in value once they've been on monument land. OK, so that's standing. On reviewability, Judge Carson, you're asking, the Supreme Court's reviewed this twice. What do we make of that? I agree with the government it doesn't answer the sovereign immunity question, because they brought the suit. But it destroys their Dalton argument. Dalton is entirely about cases committed to the president's discretion. If the Supreme Court thought the Antiquities Act committed this to the president's discretion, they would not review the proclamations on the merits. The last thing I would say, just on the merits, my friend tried to kind of wiggle around it. But their view of the merits of the Antiquities Act that only Richard Nixon could love. If the president declares a monument, it is not illegal.  That is not, in our view, cannot possibly be right. It's not what the Chief Justice thinks is right. It's not what the D.C. Circuit thinks. And the government's inviting a square circuit split on that regard. We would urge that this court should perform its traditional function and review these ultraviarious acts. All right? Thank you.  OK, well, we are going to take a short recess.